IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CELESTE H. DAVIS,                              )
                                               )
                        Plaintiff,             )
        v.                                     )        Case No.  06 C 1066
                                               )
ELAINE L. CHAO, Secretary of Labor, United     )        Judge Virginia M. Kendall
States Departments of Labor,                   )
                                               )
                        Defendant.             )

## MEMORANDUM OPINION AND ORDER

Plaintiff Celeste H. Davis ("Davis") filed suit against Defendant, Elaine L. Chao ("Chao"

or "Defendant")) in her official capacity as the Secretary of Labor for the United States Department

of Labor (the "DOL" or "Defendant") alleging that the DOL failed to reasonably accommodate her

disability under Section 1614.203 of the Rehabilitation Act and retaliated against her for filing a

disability discrimination complaint against the DOL.  Chao moves for summary judgment on all of

Davis's claims.  For the reasons set forth below, Chao's Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Davis is a full-time, pay grade GS-13 Program Analyst at the DOL's Office of Federal

Contract Compliance Programs ("OFCCP") in the Midwest Regional Office located in Chicago,

Illinois.  Pltf. Resp. 56.1 ¶ 1[1].  After Davis graduated from law school, she began working as a trial

attorney for the Equal Employment Opportunity Commission ("EEOC") in Chicago.  *Id.*  In 2001,

---

[1] Citations to Plaintiff's Response to Defendant's Rule 56.1(A) Statement of Material Facts have been abbreviated to "Pltf. Resp. 56.1."  Citations to Defendant's Response to Plaintiff's Statement of Additional Facts have been abbreviated to "Def. Resp. 56.1."

Davis left the EEOC and accepted a position at the DOL as the Deputy Director of Policy for the OFCCP in Washington, D.C. at pay grade GS-15. *Id.* As the Deputy Director of Policy, Davis supervised three chiefs, attended meetings, and served in her supervisor's stead when needed. Pltf. Resp. 56.2 ¶ 3. Davis's supervisor was James Melvin, the Division Director of OFCCP in the Washington D.C. office. Def. Resp. 56.1 ¶ 2; Pltf. Resp. 56.1 ¶ 2. After Davis relocated to Washington D.C., she chose to maintain her Chicago residence. Pltf. Resp. 56.1 ¶ 7.

The Washington D.C. office is the "National Office." Pltf. Resp. 56.1 ¶ 3. National Office employees oversee the regional offices including the Midwest Regional Office located in Chicago, Illinois. *Id.* In turn, the Midwest Regional Office supervises district offices. Pltf. Resp. 56.1 ¶ 4. From 2002 to 2005, Sandra Zeigler ("Zeigler") was the Regional Director and Shirley Thomas ("Thomas") was the Deputy Regional Director for the Midwest Region of the OFCCP in Chicago, Illinois. Def. Resp. 56.1 ¶¶ 5, 6.

One example of National Office oversight was the DOL's waiver requirement for GS-13 and GS-14 level employees in the regional offices. Def. Resp. 56.1 ¶ 7. When a GS-13 or GS-14 position became vacant in a regional office, regional directors were required to prepare a memorandum setting forth the title of the position, its description, and the date when it became vacant. Def. Resp. 56.1 ¶ 7. Before a regional office could file a vacant position, the National Office had to approve the memorandum and agree with the need to fill the vacant position. Def. Resp. 56.1 ¶ 7. Charles James ("James") was the Agency Director of the OFCCP at the DOL in Washington, D.C. Regional directors frequently contacted James to discuss filling GS-13 and GS-14 vacancies prior to preparing the written memorandum seeking his approval to fill the vacant position. Def. Resp. 56.1 ¶ 8.

Sometime in 2002, Davis spoke to James about the financial hardship she experienced maintaining a home in Chicago and an apartment in Washington, D.C. and asked for assistance such as a temporary relocation to the Chicago area. Pltf. Resp. 56.1 ¶ 7. She also told James that she was very interested in becoming a Cook County Judge. Pltf. Resp. 56.1 ¶ 8.

During the summer of 2002, Davis began experiencing health problems including a persistent cough and pain. Pltf. Resp. 56.1 ¶ 9. Though she had relocated permanently to Washington D.C., Davis chose to seek treatment from physicians in Chicago. *Id.* Davis advised Melvin that she needed to take extended sick leave or vacation to receive extended medical attention and treatment for her deteriorating medical condition. Def. Resp. 56.1 ¶ 9. Davis's request was granted and on November 1, 2002 Davis began an eight-week medical leave of absence to undergo a lung biopsy and to treat symptoms that included moderate to severe joint and muscle aches in the hands, knees and feet, as well as periodic bouts of extreme exhaustion and fatigue. Def. Resp. 56.1 ¶ 10; Davis Ex. AA.[2] Davis was ultimately diagnosed with emphysema and fibromyalgia. Pltf. Resp. 56.1 ¶ 10.

On December 31, 2002, Davis submitted her first job reassignment request asking the DOL to relocate her position as Deputy Director from Washington, D.C. to her home in Chicago, Illinois. Pltf. Resp. 56.1 ¶ 11. Alternatively, Davis requested that she be reassigned to a GS-15 slot in any component of the DOL in Chicago. *Id.* Although Davis stated that she was quite capable of performing the essential functions of her deputy position in Washington D.C., she believed that working in Washington was not in her best interest because her medical team, family, church and other support groups who were able to assist her on "flare up" days were located in Chicago. Dr.

_____

[2] Several of Plaintiff's Rule 56.1 Statements are not supported with citations to the record, and thus, will not be considered pursuant to Federal Rule of Civil Procedure 56.1

Naureckas was Davis's physician in Chicago and Davis attached Dr. Naureckas's letter to her reassignment request.  Pltf. Resp. 56.1 ¶ 12.  In his letter, Dr. Naureckas stated that Davis's "ability to work has been significantly affected, and she is presently unable to continue to work in her previous capacity as currently structured".  Pltf. Resp. 56.1 ¶ 12.  Davis never asked Dr. Naureckas for a referral to a physician in Washington D.C.  *Id.*

On February 21, 2003, Melvin responded to Davis's request in writing and denied her request to relocate her Deputy Director position from Washington D.C. to her home in Chicago.  Def. Resp. 56.1 ¶ 16.  Melvin explained, "[t]he Deputy Director's job is a senior level supervisory position, which has been classified and located in Washington, D.C.  Because of our need to maintain and retain a strong and consistent National Office presence, we are unable to restructure the position in a way that would allow it to be performed from your residence in Chicago.  It is our desire to work with you so that you may contemplate all options that can equally balance our need to utilize your many talents and your need to continue to get well."  *Id.*; Davis Ex. X.

Instead of permanent relocation, the DOL offered Davis a 120-day temporary assignment (a "detail") to unspecified duties to allow her to work out of her Chicago home under the supervision of her Washington superiors while she was undergoing treatment.  Pltf. Resp. 56.1 ¶ 13.  Davis accepted, relocated to Chicago, and began working out of her home.  Although management officials made efforts to allow Davis to work from her home, problems with Davis's home computer compelled her to work out of an office in Chicago's Kluzinski Federal Building.  *Id.*  At the end of her first 120-day detail, the agency granted Davis a second temporary 120-day detail.  Pltf. Resp. 56.1 ¶ 14.

Meanwhile, a GS-14-level OFCCP employee in the Chicago office, Avery Goodrich

("Goodrich") requested to be reassigned out of the Chicago office to the Washington D.C. office because his working relationship with Thomas and Ziegler had become difficult. Def. Resp. 56.1 ¶¶ 15, 17. Approximately one month later, Melvin suggested to Zeigler that Goodrich be reassigned to the GS-15 Deputy Director position in Washington, D.C. then held by Davis and that Davis be reassigned to the GS-14 position then held by Goodrich in the Chicago Office. Def. Resp. 56.1 ¶ 15. The employee "swap" never occurred.

On May 13, 2003, Davis submitted a second request to be reassigned from Washington, D.C. to Chicago, Illinois. This time, Davis specifically asked the DOL to provide her with assistance in searching for a "reasonable accommodation" in the form of either a GS-14 or GS-15 position. Pltf. Resp. 56.1 ¶ 14. In doing so, Davis offered to voluntarily resign from her GS-15 Deputy Director position in Washington, D.C. Def. Resp. 56.1 ¶ 14. Davis's May 13, 2003 letter further stated that her physician had diagnosed her with severe emphysema and fibromyalgia and that:

> "[s]ince beginning the detail, with rare exception, I have been able to work every day. My condition has stabilized, but I still experience 'flare-up' days, which are difficult, painful days when I may require some assistance. On those days, for example, my family assists me by driving for me, cooking my meals and helping with other everyday activities that are difficult for me to perform and may well be with me for the remainder of my life. In addition, I continue to have medical visits with my physicians every six to eight weeks where I am reevaluated and my medications adjusted if necessary. Despite these limitations, I am able to work and believe that a permanent job assignment in Chicago would now be in my best interests."

*Id*.; Davis Ex. I.

On July 16, 2003, Nancy Ponton, Director of the Division of Human Resources Management, Employment Standards Administration in Washington, D.C. forwarded Davis's May 13, 2003 request to be reassigned to the Chicago Regional Office to Kate Dorrell ("Dorrell"), the Director of the Equal Employment Opportunity ("EEO") Unit for the Employment Standards

Division in Washington D.C.  Pltf. Resp. 56.1 ¶ 20.  During the same month and while Davis's May 13, 2003 reassignment request was pending, Davis applied for a GS-14 Chicago District Director position in Chicago that was posted on the DOL website.  Pltf. Resp. 56.1 ¶ 14.[3]  When the position was initially posted in 2002, it was listed as a temporary position and Davis did not apply for it.  *Id.* This time, the DOL announced that it intended to convert the temporary position into a permanent assignment.  Pltf. Resp. 56.1 ¶ 15.

At some point during the late summer, the DOL asked Dr. Neal. L Presant ("Dr. Presant") to review Davis's medical records, speak to Dr. Naureckas, and assess Davis's workplace accommodation request.  Pltf. Ex. O.  On August 12, 2003, Dr. Presant wrote Annabelle Lockhart ("Lockhart"), Director of Civil Rights at the Office of the Assistant Secretary for Administration and Management and detailed his findings.  Pltf. Ex. O.  Dr. Presant found that "Ms. Davis does suffer from a qualifying disabling condition."  Def. Resp. 56.1 ¶ 25.  However, Dr. Presant did not see any medical contraindication to Davis performing the essential functions of her job in Washington D.C. with the exception of the "occasional brief visits to factories, businesses, schools, or other sites during fact finding."  Ex. O.  Dr. Presant recommended that those functions be minimal and involve limited walking or other exertion.  *Id.*  Nevertheless, with the exception of off-site visits, Dr. Presant believed that Davis was capable of performing the specified duties of her Deputy Director position which was sedentary.  *Id.*  Accordingly, Dr. Presant opined that Davis's requested accommodation would only serve to help her perform her job indirectly by providing her with a more secure home environment.  *Id.*  However, he emphasized that "[t]he only accommodation relevant appears to be

---

[3]  On July 30, 2003, the Midwest Region emailed the OFCCP District Directors stating that the Midwest Region had three managerial positions open including the District Director position in Chicago. Def. Resp. 56.1 ¶ 24.

[Davis] being near to her Chicago relatives. The location, rather than the nature of the job seems to be the major issue." *Id.* Finally, Dr. Presant added that Davis's condition had a reasonable likelihood of worsening in the next few years so that her capabilities would potentially be less in the future. *Id.*

On August 15, 2003, the Chicago Regional Office received Davis's application for the vacant GS-14 position. Def. Resp. 56.1 ¶ 26. Two weeks later, having received Dr. Present's recommendation, Dorrell told Melvin that the Public Health Services ("PHS") assessment of Davis's request for accommodation was completed and that the specific recommendation was to "encourage supervisors and employees to work together to put an accommodation in place based on the PHS assessment." Def. Resp. 56.1 ¶ 27.

On September 12, 2003, Davis's July 2003 application for the vacant GS-14 position for Chicago District Director was certified "qualified as eligible" for a noncompetitive appointment by the Regional Human Resources Officer of the DOL in Chicago, Illinois. Def. Resp. 56.1 ¶ 28. Yet ultimately, Davis was not offered the position; instead Duane Grapperhaus ("Grapperhaus") was offered the position. PLtf. Resp. 56.1 ¶ 15. Grapperhaus applied for the position in 2002 when it was posted as a temporary assignment and Thomas allowed Grapperhaus to remain in the position when it was converted to a permanent assignment. *Id.* The parties dispute whether Thomas knew of Davis's application prior to making her hiring decision.[4] Pltf. Resp. 56.1 ¶ 15; Def. Resp. 56.1 ¶ 31. Thomas cancelled the vacancy announcement on September 19, 2003 after she hired

_____

[4] According to Linda Bartucca ("Bartucca"), Thomas's assistant, Thomas told her sometime during the selection process that she had not selected Davis to fill the vacant GS-14 District Director position "because of her medical disability because that office is too stressful and it would just impact her medical disability." Def. Resp. 56.1 ¶ 31; Ex. H, p. 103-04. Thomas told Bartucca that Davis "would end up being off work." Thomas denies knowing about Davis's application prior to selecting Grapperhaus. Pltf. Resp. 56.1 ¶ 16.

Grapperhaus.  Pltf. Resp. 56.1 ¶ 16; Def. Resp. 56.1 ¶ 29.

On October 23, 2003, the DOL denied Davis's May 13, 2003 request for permanent assignment to Chicago.  Def. Resp. 56.1 ¶ 32.  In his letter, Melvin relayed Dr. Presant's conclusion to Davis that although she suffered from a "qualifying disabling medical condition" there was "no medical evidence" that she was incapable of performing the essential functions of her Deputy Director position in Washington D.C.  *Id*.  Because the medical record did not establish that she required an accommodation to perform the essential functions of her position, Melvin denied Davis's permanent reassignment request and directed her to return to her Washington D.C. duty station at the conclusion of her second 120-day temporary detail.  *Id*.; Def. Resp. 56.1 ¶ 17.[5]  Melvin asked Davis to advise the DOL if her condition changed so that it could address any future need for an accommodation. Pltf. 56.1 Resp. at  17.

In October 2003, while Davis was on temporary detail in Chicago, the Chicago Office posted two GS-14 vacancies entitled Program Analysis Officer and Director of Planning and Support.  Def. Resp. 56.1 ¶ 33.  Michelle Ouellet ("Ouellet"), the Director of Management Administration and Planning at the OFCCP in Washington D.C., contacted Thomas in Chicago and asked Thomas to consider Davis for the vacant GS-14 position of Director of Planning and Support.  Def. Resp. 56.1 ¶¶ 4, 34.  Thomas replied, "She needs to apply like everyone else.  That is up to Ms. Zeigler."  *Id*. Both GS-14 vacancies were cancelled on or before October 28, 2003 and the positions have never been filled.  *Id*.; Davis Ex. Z; Def. 56.1 ¶ 19.  The parties dispute whether the OFCCP's National Office planned to reduce the number of district directors in the district offices in 2001.  Pltf. Resp.

---

[5] Davis maintains that Paragraph 17 in Defendant's Statements of Fact does not accurately reflect the medical evaluation but does not support her denial with a citation to the record.  Davis adds that Melvin's letter does not comment about the vacant GS-14 position that Thomas gave to Grapperhaus three weeks earlier.  Pltf. Resp. 56.1 ¶ 17.

56.1 ¶ 5.[6]  However, it is undisputed that the Midwest Region reduced the number of district directors from ten to three from 2001 to the present.  Pltf. Resp. 56.1 ¶ 5.

Davis's second 120-day detail was scheduled to expire on October 31, 2003.  After denying Davis's May 13, 2003 request for permanent reassignment, the DOL granted Davis's request for a 30-day extension on her temporary duty assignment.  Pltf. Resp. ¶ 18.  Davis contacted an EEO counselor regarding her complaints on November 4, 2003 and filed an informal complaint on November 13, 2003.  Def. Resp. 56.1 ¶ 35; Pltf. Resp. 56.1 ¶ 22.[7]  Davis returned to Washington D.C. on December 1, 2003 and filed an administrative complaint on December 20, 2003.  *Id.*

Less than one month later, in January 2004, Davis applied for and Thomas hired her as a GS-13 Program Analyst– a permanent position in Chicago.  Pltf. Resp. 56.1 ¶ 20.  She returned to the Chicago home that she maintained throughout her Washington D.C. employment in June 2004.  *Id.*  For the sixth-month period before Davis left Washington D.C. permanently (between January and June 2004), Davis performed her duties at the "highly effective" level.  *Id.*  Davis has always lived alone.  *Id.*

In December 2004, Thomas offered Davis a GS-14 District Director position in Columbus, Ohio, to be managed remotely from Chicago with limited travel.  Pltf. Resp. 56.1 ¶ 21.  Davis declined, indicating that it would not be in her medical best interest and that she feared that

---

[6] Davis denies that the OFCCP had a long-term plan to reduce the number of district directors and cites James's testimony in support of her assertion that Zeigler chose not to fill every position that became vacant.  Davis's assertion that "In essence, the record indicates that Zeigler and Thomas simply chose to not hire people they did not believe were competent, and instead merely held the positions for themselves" was unsupported in the record, conclusory, and therefore, will not be considered.

[7] The parties' Rule 56 Statements misstate the record.  According to the exhibits attached to the Rule 56 Statements, Davis wrote Lillian Winstead, a DOL counselor, on November 4, 2003.  Davis Ex. U.  Davis's "informal complaint" was filed on November 13, 2003 and Davis's formal administrative complaint was filed on December 20, 2003.  Def. Ex. 18.

accepting the job would adversely affect her EEO case. *Id.* [8] While employed in the Regional Office, Linda Bartucca ("Bartucca"), Thomas's assistant, observed Thomas assign Davis to a small work cubicle typically reserved for GS-5 grade employees and also observed Thomas replace "more prestigious work assignments with "GS-8 level" work assignments. Def. Resp. 56.1 ¶ 38.

On December 23, 2005, Dr. Naureckas updated Davis's medical records and responded to Dr. Presant's evaluation and recommendation. Def. Resp. 56.1 ¶ 39. Dr. Naureckas opined that Davis's lung disease would worsen over time, that she would continue to require extended periods of sick leave, and that he planned to refer Davis for evaluation for a lung transplant. *Id.* Dr. Naureckas further stated that family support and Davis's reassignment to Chicago area would be critical to her treatment. *Id.*

On January 8, 2006, Dr. Naureckas updated Davis's medical records and stated that Davis continued to undergo extensive medical treatment and evaluation, that additional medical problems had been discovered, and that Davis had been referred to an associated gastroenterology clinic for further examination and treatment. Def. Resp. 56.1 ¶ 40. Dr. Naureckas further opined that Davis's permanent assignment in the Chicago area was recommended to properly evaluate Davis's response to therapy and to monitor her progress. *Id.* at 40.

During both her tenure as deputy in Washington and the two 120-day details granted by the agency, Davis admits that she was able to do all duties assigned to her. Pltf. 56.1 Resp. at 18.

**STANDARD OF REVIEW**

---

[8] Davis states that she did not accept the position because the GS-14 Columbus position was a "set-up" so that the DOL could terminate her in the future. However, Davis does not cite the specific testimony in the record in her Response to Defendant's Statements of Fact nor did she timely report it to the EEO counselor.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

Davis alleges that the DOL's refusal to transfer her[9] to the Chicago Regional Office from the Washington, D.C. Office was unreasonable and constitutes a failure to reasonably accommodate her

---

[9] Following the filing of Davis's Complaint, the DOL hired Davis as a program analyst in the Chicago Regional Office but Davis did not amend her complaint to reflect that she was ultimately relocated to Chicago.

disability under § 1614.203 of the Rehabilitation Act.[10]  Cplt. ¶ 24.  Davis also alleges that the DOL

retaliated against her for submitting her May 13, 2003 request for an accommodation.  Cplt. ¶¶ 27,

28, 30.  Chao argues that she is entitled to summary judgment because Davis failed to timely seek

EEO counseling, she did not administratively exhaust many of her claims, she was not disabled

under the Act, and failed to put forth a prima facie case of retaliation.  Def. Mtn., p. 7.

I.      Whether Davis's claims are barred as untimely for or her failure to exhaust her
        administrative remedies

        Before an employee can file a discrimination claim against a government agency, she must

exhaust her administrative remedies by filing a complaint with the EEO department of her agency.

42 U.S.C. § 2000e-16(c).  An aggrieved person must initiate contact with a Counselor within 45

days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within

45 days of the effective date of the action.  29 C.F.R. § 1614.105(a)(1).  If the employee does not

comply with this timetable, she cannot pursue her claims in court.  *See e.g., Miller v. Runyon*, 77

F.3d 189, 191 (7th Cir. 1996) (a plaintiff's suit under the Rehabilitation Act is barred if the

administrative complaint was untimely).  Here, Davis contacted an EEO counselor regarding her

complaints on November 4, 2003, filed an informal complaint on November 13, 2003, and filed an

---

[10]  Section 1614.203 of the Rehabilitation Act states:

(a) Model employer. The Federal Government shall be a model employer of individuals with
disabilities. Agencies shall give full consideration to the hiring, placement, and advancement
of qualified individuals with disabilities.

(b) ADA standards. The standards used to determine whether section 501 of the
Rehabilitation Act of 1973, as amended (29 U.S.C. 791), has been violated in a complaint
alleging nonaffirmative action employment discrimination under this part shall be the
standards applied under Titles I and V (sections 501 through 504 and 510) of the Americans
with Disabilities Act of 1990, as amended (42 U.S.C. 12101, 12111, 12201), as such sections
relate to employment. These standards are set forth in the Commission's ADA regulations
at 29 CFR part 1630.

administrative complaint on December 20, 2003. Chao concedes that Davis sought EEO counseling within 45 days of the October 23, 2003 denial of her second request but argues that "much of Count I of Davis's complaint related to her December 2002 request for an accommodation. " Although Davis initially requested relocation in December 2002, her claim under the Rehabilitation Act does not seek damages resulting from Chao's failure to permanently transfer her in December 2002. Resp., p. 16. Rather, Davis seeks damages based upon the DOL's failure to transfer her to the Chicago Regional Office after her May 13, 2003 request. (Davis Resp., p. 16; Cplt. pp. 6-7). Davis's May 13, 2003 request was denied on October 23, 2003 and Davis notified the EEO on November 4, 2003. Therefore, Davis's action is not time barred.

Chao further argues that several of Davis's allegations in Counts III and IV are untimely. First, Davis's allegations that Thomas failed to place her as the Chicago District Director upon Grapperhaus's retirement; that Thomas retaliated against her by reassigning her GS-13 and FOIA duties in July of 2005; and that Thomas retaliated against her by not approving Davis's request for "flexi-place" in August of 2005 are not contained in either parties Rule 56 Statements.[11] Accordingly, whether Davis timely sought EEO counseling on those claims is irrelevant because there is no evidence before the Court supporting them. The only remaining allegations are that James approved of the Chicago District Director position as temporary in 2002 and that Thomas retaliated against Davis when she offered Davis a GS-14 position managing the Columbus, Ohio office from Chicago. Regarding James's approval of the temporary nature of the District Director position, Davis does not allege that James' initial approval of the temporary nature of the position

_____

[11] Davis make vague references to receiving less prestigious work assignments in her Rule 56.1 Statements.

in 2002 was discriminatory especially since Davis did not apply for the temporary position. Accordingly, the alleged discriminatory act did not occur until that position was converted to a permanent position and offered to Grapperhaus instead of Davis on September 19, 2003. *Flannery v. Recording Indus. Ass'n of America*, 354 F.3d 632, 637 (7th Cir. 2004) (there must be a final, non-tentative decision and the employer must give the employee unequivocal notice of the final decision to trigger the date of an unlawful employment practice). Because Davis reported to the EEO counselor on November 4, 2003 she timely reported this conduct. However, Davis's allegation that Thomas's decision to offer her the GS-14 position managing the Columbus, Ohio office was retaliatory was not timely reported to the EEO counselor, and therefore, will not be considered.[12]

## II. Davis's claims under the Rehabilitation Act

A plaintiff establishes a prima facie case of disability discrimination under the Rehabilitation Act by proving: "(1) that she suffers from a disability as defined in the statutes; (2) that she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) that she has suffered an adverse employment action as a result of her disability." *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). Courts look to case law under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 et seq. (2000) to decide cases brought under the Rehabilitation Act since the prima facie requirements under the ADA and the Rehabilitation Act are similar. *See Scheerer v. Potter*, 443 F.3d 916, 918 (7th Cir. 2006). Davis must prove that she is "disabled," as defined by the ADA before she may avail herself of the

---

[12] Thomas offered Davis the position in December 2004 and Davis did not contact the EEO counselor until November 2005. Davis does not oppose this argument in her Response brief. Even if this Court were to consider this allegation, Davis failed to prove that offering a Chicago-based position to manage the Columbus, Ohio office was adverse except for her own conclusory statement. Davis's belief that the job was a "set-up" so that the DOL could terminate her in the future is wholly unsupported in the record.

substantive anti-discrimination provision set forth under the Rehabilitation Act.  Chao contends that

Davis has not submitted sufficient evidence to create a triable issue as to whether Davis is disabled

for purposes of the Act.

A)      Whether Davis suffers from a "qualifying disability"

Under the ADA, "disability" is defined as (A) a physical or mental impairment that

substantially limits one or more of the major life activities of such individual; (B) a record of such

an impairment; or (C) being regarded as having such an impairment. §12102(2).  Davis argues that

her disability falls under the first definition which requires a three step inquiry asking whether: 1)

her condition constitutes an impairment under the ADA; 2) the activity upon which she relies

constitutes a major life activity; and 3) the impairment substantially limits the performance of the

major life activity.  *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789 (7th Cir. 2005) (*citing

Bragdon v. Abbott*, 524 U.S. 624 (1998)).

To survive summary judgment, Davis must put forth evidence that she is substantially limited

in a major life activity.  *Scheerer*, 443 F.3d at 919 (*citing Bragdon*, 524 U.S. at 637-38).  To be

"substantially limited," an individual must have an impairment that "prevents or severely restricts"

the individual from doing activities that are of central importance to most people's daily lives and

that the impairment's impact must also be "permanent or long term" and that 'the extent of the

limitation . . . in terms of [the plaintiff's] own experience . . . is substantial.'"  *Stein v. Ashcroft*, 284

F.3d 721, 726 (7th Cir. 2002) (*quoting Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122

S. Ct. 681, 691, 151 L. Ed. 2d 615 (2002)).

Davis contends that the medical evidence supports that the suffered from a qualified

disabling condition.  Yet, proof of a medical diagnosis of an impairment alone is insufficient to

prove disability status under this test. *Tokyo*, 534 U.S. at 198. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Id.*; *citing Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 563 (1999) (a diagnosis of monocular vision is not invariably a disability, but must be analyzed on an individual basis, taking into account the individual's ability to compensate for the impairment). In other words, whether an individual meets the ADA's definition of disabled requires an individualized, case-by-case analysis. *See DePaoli v. Abbott Labs.*, 140 F.3d 668, 672 (7th Cir. 1998); *See Bragdon*, 524 U.S. 624 at 627-28 (declining to consider whether HIV infection is a per se disability under the ADA); *See* 29 CFR pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual"). Accordingly, Davis must put forth evidence that she is substantially limited in activities that are of "central importance to . . . daily life," including, "performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Sears*, 417 F.3d at 798 (*citing Toyota*, 534 U.S. at 198; 29 C.F.R. § 1630.2(I).[13]

Davis suffers from emphysema and fibromyalgia. Her symptoms included a persistent cough and pain, moderate to severe joint and muscle aches in the hands, knees and feat, as well as periodic bouts of extreme exhaustion and fatigue. Davis's coughing spasms lasted several seconds to several minutes and their frequency ranged from a couple an hour to two or three a day. Def. Ex. 2, p. 40-

---

[13] According to ADA regulations, "substantially limits" means: (I) "[u]nable to perform a major life activity that the average person in the general population can perform" or (ii) "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1).

42. As for sleeping and talking, a coughing spasm could wake her up or cause her to be unable to speak during the spasm. *Id*. at 43. Additionally, on "flare up" days, Davis's family is forced to assist her with activities such as driving, cooking her meals, and "helping with other everyday activities that are difficult for [her] to perform..." Davis's "flare ups" occurred two or three days a month to once every four months. *Id*. at 45. Dr. Presant noted that although Davis could perform the essential functions of her sedentary position, he recommended that the DOL limit her visits to off-site facilities be minimal and involve limited walking or other exertion. He further concluded that "Ms. Davis does suffer from a qualifying disabling medical condition. The condition is emphysema, which restrict breathing and thereby impairs endurance." Pltf. Ex. O. Dr. Presant felt the condition would progress with time, that Davis was limited to sedentary work, and that she was not capable of major exertion.

Davis's testimony regarding her physical limitations coupled with her physicians' diagnosis is sufficient to create a triable issue of fact regarding whether she was substantially limited in major life activities such as breathing, talking, and walking. Her physicians concluded that her disability is permanent and will continue to worsen with time. Although Chao argues that Davis's symptoms are intermittent, and thus, are not disabling, a broken leg is an example of an intermittent symptom. *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995); 29 C.F.R. pt. 1630 app., § 1630.2(j); *Evans v. City of Dallas*, 861 F.2d 846, 852-53 (5th Cir. 1988). While Davis's spasms, fatigue, and pain are intermittent in terms of their frequency, they are "intermittent impairment[s] that are a characteristic manifestation of an admitted disability" and therefore, they are a condition that Davis's employer must reasonably accommodate. *Vande Zande*, 44 F.3d at 544. In summary, Davis put forth more than her own self-serving statements regarding the level and

frequency of her impairment including the opinions of the DOL's hired doctor and those of Dr. Naureckas. *See e.g., McPhaul v. Board of Com'rs of Madison County*, 226 F.3d at 564 (7th Cir. 2000) (Plaintiff's self-serving testimony in support of her reasonable accommodation claim was not sufficient for a reasonable jury to find that she is a qualified individual with a disability under the ADA.) Accordingly, Davis has provided sufficient evidence that she is a qualified individual with a disability.

B)    Whether Davis was entitled to a reassignment as a reasonable accommodation

Davis claims that the DOL's refused to reasonably accommodate her disability when it refused to reassign her to a Chicago-based GS-14 or GS-15 position. "Under the ADA, an employer must make 'reasonable accommodations' to a disabled employee's limitations, unless the employer can demonstrate that to do so would impose an 'undue hardship.'" 42 U.S.C. § 12112(b)(5)(A)). The issue of "whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002). In 1992, Congress amended the Rehabilitation Act to provide that the standards for determining what constitutes employment discrimination "shall be the standards applied under Title I of the Americans with Disabilities Act." Act of October 29, 1992, Pub. L. No. 102-569, Title V, § 506, 106 Stat. 4360, 4428. Thus, the Rehabilitation Act incorporates the ADA's definition of reasonable accommodation, which recognizes reassignment to a vacant position as a potential accommodation required under the ADA:

> job restructuring, part-time or modified work schedules, *reassignment to a vacant position*, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individual with disabilities.

42 U.S.C. § 12111(9)(B) (emphasis added). "Except for limiting an employer's obligation to reassign a disabled employee to a vacant position, neither the statute nor the regulations provide much guidance for determining under what circumstances and to what extent an employer may be obligated to reassign a disabled employee (i.e., whether an employer may be required to consider transferring the employee to a similar position in the same office or department, a similar position in a different office or department, or a different type of position whether in the same or different office or department)." *Gile v. United Airlines*, 95 F.3d 492, 497 (7th Cir. 1996). The EEOC's interpretive guidance, which is located in an appendix to the regulations, provides more useful detail:

> In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship. . . . Reassignment may not be used to limit, segregate, or otherwise discriminate against employees with disabilities by forcing reassignments to undesirable positions or to designated offices or facilities. Employers should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time. . . . *An employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation.*

29 C.F.R. app., § 1630.2(o) (emphasis added).[14]

The regulations under the Rehabilitation Act were amended in 1992 and make explicit and expansive reference to a federal employer's obligation to reassign an otherwise qualified

---

[14] In looking to the EEOC's interpretive guidance, the Supreme Court instructs Courts regarding its persuasive weight: "As an 'administrative interpretation of the Act by the enforcing agency,' these Guidelines, 'while not controlling upon courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort to guidance.'" *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986) (*quoting General Elec. Co. v. Gilbert*, 429 U.S. 125, 141-42 (1976), and *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34 (1971)) (*citation omitted*).

handicapped employee. They states: "[w]hen a nonprobationary employee becomes unable to perform the essential functions of his or her position even with reasonable accommodation due to a handicap, an agency shall offer to reassign the individual to a funded vacant position located in the same commuting area and serviced by the same appointing authority, and at the same grade or level, the essential functions of which the individual would be able to perform with reasonable accommodation if necessary unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program." 29 C.F.R. § 1614.203(g). The undisputed material facts establish that even assuming that Davis was "disabled" within the meaning of the ADA, there was no failure to reasonably accommodate her disability. On that ground, Chao is entitled to summary judgment on Davis's claim.

First, Davis conceded that she was capable of performing the essential functions of her job in Washington D.C. without an accommodation. Although the Seventh Circuit has yet to address whether a disabled person who can perform all essential functions of a job without any accommodation may still be entitled to a reasonable accommodation, the federal regulations suggest that reassignment is not necessary unless an employee "becomes unable to perform the essential functions of his or her position." *See Rauen v. United States Tobacco Mfg*., 319 F.3d 891, 897 (7th Cir. 2003); *see also* 29 C.F.R. § 1614.203(g) (emphasis added) (When a nonprobationary employee *becomes unable to perform the essential functions of his or her position* ... an agency shall offer to reassign the individual to a funded vacant position...unless the agency can demonstrate that the reassignment would impose an undue hardship on the operation of its program.)[15] Not only was

---

[15] Other Circuits addressing this issue have concluded that plaintiff who, though disabled, can perform all essential functions of the job without accommodation, cannot prove the reasonableness of any requested accommodation. *Id.*; *citing Black v. Wayne Ctr.*, 2000 U.S. App. LEXIS 17567, at *9-*10, No.

Davis capable of performing the essential functions of Washington D.C. position, she performed them at the "highly effective" level. During the six month period between January 2004– when Davis was initially hired to work in Chicago-- and June 2004– when Davis permanently relocated to Chicago, there was no evidence that her "flare up" days adversely affected her ability to do her job. In fact, Davis failed to show that the symptoms she experienced on "flare up" days were causally related to her ability to do her job. Rather, the evidence showed that when Davis experienced "flare ups" two to three days a month to once every four months, she needed the assistance of family and friends to drive, cook, and engaged in everyday activities– and not activities related directly to her sedentary job. Davis failed to put forth evidence that she could not find similar support systems in Washington D.C. nor did she prove that the DOL refused to accommodate Davis on the days that she couldn't cook, drive, or perform everyday tasks.

Additionally, Davis did not put forth evidence that her Washington D.C. location made it impossible for her to pursue therapy or treatment for her handicap or that a transfer prevented her from enjoying the privileges and benefits of employment equal to those enjoyed by non-handicapped employees.[16] Because the record did not support Davis's assertion that her transfer was medically necessary to perform the essential functions of her job, she failed to show that the DOL was

99-1225 (6th Cir. July 6, 2000) (per curiam).

[16] The Act requires an employer to grant a request for accommodation where the accommodation in question is reasonable and makes it possible for handicapped employees to (1) perform the essential functions of the job in question, *Fedro v. Reno*, 21 F.3d 1391, 1395 (7th Cir. 1994); *citing School Board of Nassau County v. Arline*, 480 U.S. 273, 289 (1987); *Bradley v. University of Texas M.D. Anderson Cancer Center*, 3 F.3d 922, 925 (5th Cir. 1993); *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1035-36 (2d Cir. 199; *Shea v. Tisch*, 870 F.2d 786, 789-90 (1st Cir. 1989); *Lyles v. Dept. of the Army*, 864 F.2d 1581, 1583 (Fed. Cir. 1989) (2) pursue therapy or treatment for their handicap, Buckingham, 998 F.2d at 740, or (3) enjoy the privileges and benefits of employment equal to those enjoyed by non-handicapped employees. *Fedro*, 21 F.3d at 1395; *citing Buckingham v. United States*, 998 F.2d 735, 740 (9th Cir. 1993); *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir. 1992).

obligated to accommodate a request that was nothing more than one Davis preferred and that benefitted her personally. *Schmidt v. Methodist Hospital*, 89 F.3d 342 (7th Cir. 1996) (An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.)*; See* 29 CFR 1630.9, App 1630.9 (the obligation to provide reasonable accommodation does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability).

But even if it is determined that a person such as Davis who can admittedly perform all the essential functions of her job could be entitled to a reasonable accommodation, Davis failed to put forth evidence that the DOL failed to reasonably accommodate her. *See Rauen*, 319 F.3d at 897 ("We need not decide this broad issue, however, because even assuming that some accommodations would be reasonable for a person, like [plaintiff], who can perform all essential functions of a job without any accommodation, the specific accommodation that [the plaintiff] has requested in this case is not reasonable.) The DOL put forth evidence that transferring Davis's Deputy Director position would impose an undue burden on the DOL, that the remaining GS-14 positions were filled or cancelled, and most importantly, that the DOL ultimately hired Davis at the GS-13 level in Chicago less than one month after she was told to return to Washington D.C. Additionally, the record reflected that the DOL did accommodate Davis by giving her two 120-day details in Chicago, a 30-day extension, and then a permanent position in Chicago.

With respect to Davis's first and informal request to transfer her GA-15 Deputy Director position to Chicago, the DOL put forth undisputed evidence that to do so would result in an undue burden. Davis admits that her duties as the Deputy Director included supervising three GS-14 chiefs, attending meetings, and serving in her supervisor's stead when needed. Davis's supervisor

was located in Washington D.C. Accordingly, the DOL put forth evidence that the essential functions of Davis's Deputy Director position required her to be located in Washington D.C.[17] *See Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) (We shall not "second-guess the employer's judgment as to the essential functions" of a position.)

Davis's arguments that the DOL was obliged to offer her the GS-14 position offered to Grapperhaus and the two GS-14 positions that were posted but later cancelled are similarly unpersuasive. The duty to reasonably accommodate does not require an employer to bump an incumbent from a position in order to create an opening. *See e.g. Gile*, 95 F.3d at 499. Nor does the Act require an employer to give preferential treatment in the hiring process to the disabled employee. *See Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) ("We do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."), *cert. denied*, 134 L. Ed. 2d 211, 116 S. Ct. 1263 (1996). In this case, the DOL reasonably chose to hire Grapperhaus when the position changed from temporary to permanent as opposed to bumping Grapperhaus in favor of Davis because Grapperhaus had been working in the position for over a year. Additionally, the other GS-14 positions were cancelled and never filled supporting the DOL's position that the office chose to reduce the number of district directors— an assertion that is further supported in the record by the reduction in the number of district directors from ten to three from 2001 to the present. Davis has the burden of showing that a position for which she was qualified was vacant. *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001).

---

[17] In fact, Davis concedes in her Response that Count I "refers only to the denial of the Davis's request for reassignment to Chicago submitted in May 2003." Resp. p. 16.

A position, however, is not vacant if the employer has elected not to fill the position based on a reason that is wholly independent of the plaintiff's disability and there was no evidence that Thomas cancelled the vacant GS-14 positions because of plaintiff's disability. *Id*. at 841.

The record also reflects that the DOL reasonably accommodated Davis. The DOL temporarily assigned Davis to Chicago for eight months and granted her a 30-day extension in November. Davis was in Washington D.C. for less than a month when Thomas hired her for the GS-13 position in Chicago. A reasonable jury could not find based upon this evidence that the one-month delay in transfer constituted an adverse employment action. *See Jay v. Intermet Wagner, Inc*., 233 F.3d 1014, 1017 (7th Cir. 2000) (20-month delay not unreasonable when employer acts reasonably and in good faith); *see also Claveria v. Field Museum of Natural History*, 15 Am. Disabilities Cas. (BNA) 1403, * 19 (N.D. Ill. 2004) (Plaintiff cannot show that the delay in transfer in this case, which was at most six months, constituted an adverse employment action.)[18]

Nor is the DOL's decision to offer Davis a position at the GS-13 level actionable. First, Davis failed to show that there was ever a GS-15 vacant position in Chicago. Second, the GS-14 positions were either filled by incumbents or cancelled. Third, "[a]n employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation." 29 C.F.R. app., § 1630.2(o). Finally, the DOL offered Davis a chance to work at the GS-14 level and Davis turned it down. When an employee, such as Davis, requests a transfer as reasonable accommodation and the

---

[18] Neither party explained by Davis remained in Washington D.C. for six months after Davis's transfer request was granted.

employer offers alternative reasonable accommodation, which the employee then refuses, the employer cannot be liable for failing to reasonably accommodate the employee by not transferring him to another position. *Schmidt v. Methodist Hospital*, 89 F.3d 342 (7th Cir. 1996). Accordingly, the record shows there was no failure to reasonably accommodate Davis's disability and Chao is entitled to summary judgment.[19]

III.    Failure to engage in the interactive process

Once Davis put the DOL on notice of her disability, the ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation. This interactive process "imposes a duty upon employers to engage in a flexible, interactive process with the disabled employee needing accommodation so that, together, they might identify the employee's precise limitations and discuss accommodation which might enable the employee to continue working." *Gile*, 213 F.3d at 373. The failure to engage in the interactive process is not a per se violation of the ADA. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000). Instead, liability under the ADA attaches only if "the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual." *Id.*; *see also EEOC v. Sears*, 417 F.3d at 797 ("employer will be liable only if it bears responsibility for the breakdown of the interactive process."). As such, even if this Court were to assume that Davis put forth sufficient evidence that her disability was not reasonably accommodated, the DOL will be

---

[19] It is noteworthy that although Davis's Complaint alleges that the DOL failed to transfer her to Chicago, she filed her Complaint prior to applying for and receiving the January 2004 GS-13 position. Later, Davis was also offered a GS-14 position in Chicago which she declined. Accordingly, while Davis's Complaint is couched in terms of a failure to transfer claim, she was ultimately transferred. At best, Davis is left with alleging that the DOL delayed transferring her to Chicago and that when it did, it transferred her to a lower-level position. For the reasons stated in this Opinion, neither claim survives as a matter of law.

liable only if it bears responsibility for the breakdown of the interactive process. *See Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)). In making this determination, "courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *See Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("courts should attempt to isolate the cause of the breakdown and then assign responsibility.")

The record shows that the DOL participated in good faith in the interactive process. As previously stated, Davis was allowed to work in Chicago for eight months while her disability claim was being evaluated by the DOL. Even after Dr. Presant concluded that Davis was capable of working in a sedentary capacity in her current Washington D.C. position, the DOL granted Davis's request for a 30-day extension. Moreover, at each and every turn, the DOL encouraged Davis to update them on her medical needs should her situation change or worsen. In the end, the DOL offered Davis a GS-14 position remotely managing the Columbus, Ohio office. Davis declined, indicating that it would not be in her medical best interest[20] and that she feared that accepting the job would adversely affect her EEO case. Accordingly, the record shows that if there was a breakdown in the interactive process– it was Davis's responsibility. Therefore, summary judgment is appropriate on Counts I of Davis's Complaint.

IV.    Davis's Retaliation Claim

The ADA prohibits retaliation against any individual who has opposed an act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a). A plaintiff may establish his retaliation claim

_____

[20] It is difficult to see how the remote deputy position fails to fulfill her specific requests: she could have remained in Chicago and received a GS-14 pay level.

with direct or indirect evidence of retaliation. *See Squibb*, 497 U.S. F.3d at 786-88. Davis proceeds

under the direct method. Resp. p. 12.[21] Under the direct method, the plaintiff must present evidence

of: (1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between

the two. *Burks,*, 464 F.3d at 758. There are two types of permissible evidence under the direct

method: direct evidence and circumstantial evidence. *Rogers v. City of Chicago*, 320 F.3d 748, 753

(7th Cir. 2003). The former "essentially requires an admission by the decision-maker that his actions

were based upon the prohibited animus." *Id.* The latter is evidence that "allows a jury to infer

intentional discrimination by the decision-maker." *Id*.

Davis argues that her May 13, 2003 request for an accommodation and her November 4,

2003 informal EEO complaint constitute statutorily protected activity.[22] Davis cites no authority for

the proposition that a mere request for a reasonable accommodation without any mention of

discriminatory conduct constitutes statutorily protected activity. The Seventh Circuit has not yet

resolved whether informal complaints constitute protected expression. *See, e.g., Rhodes v. Illinois

Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (declining to resolve "whether Rhodes engaged

in protected activity because she failed to comply with IDOT's request to formally complain in

writing"); *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001) (the Seventh Circuit has

not ruled on the issue of whether informal complaints of discrimination constitute protected

---

[21] Davis does not proceed under the indirect method of proof. Resp. p. 12. But even if she had done so, Davis failed to put forth evidence that a similarly situated employee who did not engage in a protected activity suffered an adverse employment action. The failure to satisfy one element of this prima facie case is "fatal" to the retaliation claim. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (*citing Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004)).

[22] Davis's arguments contradict the allegations in her Complaint where Davis has pleaded that her December 31, 2002 request triggered the retaliatory conduct. Moreover, most of Davis's allegations in her Complaint were not included in either parties' Rule 56 statements and as such were not considered.

expression); *but see Dillard v. Chicago Transit Auth., No. 03-3538*, 105 Fed. Appx. 107, 111, 2004 WL 1662255, at *3 (7th Cir. July 14, 2004) ("informal oral complaints do not constitute protected expression where an employer maintains a formal process for employees to communicate claims of discrimination"). Even if this Court were to assume that informal complaints can constitute protected expression, they still must be sufficiently specific so as to inform the employer about the discriminatory activity. *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity" and "a claim for retaliation is preceded by an obligatory complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity."); *see also McKay v. Town & Country Cadillac, Inc.*, 2002 U.S. Dist. LEXIS 7724, No. 97 C 2102, 2002 WL 664024, at *10 (N.D. Ill. 2002) ("A basic requirement to establishing a prima facie case of retaliation is that the employer must be aware of the employee's statutorily protected expression before the adverse action is taken against the employee.") (citations omitted). Davis's May 13, 2003 request for reassignment is not sufficiently specific to inform the DOL about alleged discriminatory conduct. Accordingly, Davis's informal requests for reassignment do not meet the definition of statutorily protected activity.[23]

However, Davis's informal complaint with the EEO on November 13, 2003 and her administrative complaint filed on December 20, 2003 constitute statutorily protected activity. Davis argues that after she filed her EEO complaint, Thomas retaliated against her by improperly manipulating the merit selection process for the GS-14 vacancies to prevent Davis's selection and

---

[23] Because Davis had yet to engage in statutorily protected activity at the time Thomas selected Grapperhaus over Davis when Grapperhaus's temporary position was converted to a permanent one, the Court need not consider whether Thomas's decision was retaliatory.

re-assignment to Chicago as a GS-14.[24]  Resp. pp. 15-16.  However, Davis failed to put forth

evidence that Thomas's cancellation of the vacant GS-14 positions was retaliatory.  The record

shows that the vacancies were cancelled, and thus, not available before or after January 2004.

Moreover, the vacancies were never reopened and filled and the DOL put forth evidence that the

district director positions were reduced from ten to three during the relevant time period.

Additionally, Davis failed to put forth direct or circumstantial evidence that Thomas's motive for

cancelling the vacancies was to retaliate against Davis for filing her EEO complaint.  To the

contrary, Thomas hired Davis as a GS-13 Analyst for the Chicago office within weeks of the filing

of Davis's EEO complaint.  In fact, there is no evidence that Thomas's motive in hiring Davis at the

GS-13 level was retaliatory and not actually an effort to accommodate Davis's request to work out

of the Chicago Office.  Finally, Thomas eventually offered Davis a GS-14 level position and Davis

declined.[25]

Davis provided evidence that Linda Bartucca observed Thomas assign Davis to a small work

cubicle typically reserved for GS-5 grade employees and also observed Thomas replace "more

prestigious work assignments with "GS-8 level" work assignments.  Although Davis's Rule 56

Statements do not identify the dates these actions occurred, Bartucca's testimony suggests that they

occurred sometime after June 2004– after Davis began working at the GS-13 level in Chicago.

Bartucca Dep. p. 144-145.  Although not argued in her brief, suspicious timing of adverse conduct

---

[24] Davis appears to have abandoned several of her claims contained in paragraph 30 of her Complaint as they were conspicuously absent from her Rule 56 statements save vague references to Thomas taking "prestigious assignments" away from Davis.  Even if this Court were to assume that Davis put forth evidence associated with those allegations, they occurred sometime after June 2004 and continued to August 2005– long after Davis's EEO complaint. Moreover, they were not timely addressed with the EEO counselor.

[25] As previously noted, Davis argues that Thomas's decision to offer the GS-14 position was a scheme to eventually terminate her was wholly unsupported in the record.

can demonstrate a causal link between the statutorily protected activity and the adverse conduct. Although a causal link may be established by a showing that the adverse conduct occurred closely following a protected activity if, however, the time between the protected activity and the discharge becomes too great, "additional proof of a causal nexus is necessary." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998). Thomas's alleged adverse conduct of assigning Davis to a cubicle and replacing "more prestigious work assignments" with "GS-8 level" work assignments, occurred at least five months after her December 2003 EEO administrative action and six months after her informal charge. As such, even if this Court were to assume that Thomas's conduct rose to the level of adverse action or created a hostile work environment, it occurred too long after Davis engaged in statutorily protected activity. *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four-month time gap is too long to sufficiently raise an issue as to any causal link); *See EEOC v. Yellow Freight Sys.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (en banc) (six-week gap between filing of EEOC charge and termination insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (one-month gap between employee's EEOC charge and her discharge insufficient to link filing of charge to termination without other evidence). Accordingly, Davis's retaliation claim does not withstand summary judgment.

V.   Conclusion and Order

For the reasons stated, Chaos's Motion for Summary Judgment is granted.

So ordered.

Date: March 31, 2008

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois